UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| RON LANCASTER, an individual, and DONITA LANCASTER, an individual, | Case No. 1:15-cv-00239-BLW |
| Plaintiffs, | MEMORANDUM DECISION AND ORDER |
| v. | |
| ROBERT KORDSIEMON, an individual, | |
| Defendant. | |

## INTRODUCTION

Pending before the Court is a Motion for Summary Judgment filed by plaintiffs Ron and Donita Lancaster (Dkt. 37) (collectively "the Lancasters") and a Motion for Summary Judgment (Dkt. 45) filed by defendant Robert Kordsiemon ("Kordsiemon").

## BACKGROUND

This proceeding involves a series of life insurance policies sold by Kordsiemon to the Lancasters. The Lancasters allege that the life insurance policies and financial advice was fraudulent and that the Lancasters relied upon Kordsiemon in purchasing the allegedly fraudulent policies.

Ron and Donita Lancaster are an elderly married couple, ages 79 and 78 respectively. *Statement of Material Facts*, at 3, ¶ 1, Dkt. 45-1. Kordsiemon is an independent sales agent who has worked for several insurance and annuity companies

through his own business venture, Kordsiemon, LLC. Beginning in 2004, Kordsiemon began making house calls to the Lancaster's home and established a friendly business relationship. *Id.* at 5, ¶ 4. In approximately June 2007 Kordsiemon sold the Lancasters a "relatively small" annuity contract that was listed in Ron Lancaster's name and had an initial premium of $60,000. *Id.* at 7, ¶ 6. This annuity was sold by the company Athene.

One year later, Kordsiemon sold the Lancasters a second financial package for a $1.5 million life insurance policy on Donita's life, from the insurance company ReliaStar. Based on discussions between the parties, the Lancasters allegedly purchased the ReliaStar policy with the primary intention of selling the policy for profit at a later time. *Id.* at 7, ¶ 7. The Lancasters allege that they relied upon Kordsiemon's financial advice that purchasing the policy and reselling it was in their financial interest. While Donita's application for the policy expressly denied that they intended to resell the policy, the Lancasters did not fill out the policy themselves. *Id.*

The policy application "sat" for over a year because the Lancasters could not afford the premium associated with the life insurance policy. *Id.* at 9, ¶ 9. At Kordsiemon's suggestion, the Lancasters obtained a reverse-mortgage to help pay for the new life insurance policy through a third party. *Id.* at 8, ¶ 7. Although the reverse-mortgage was purchased through a separate agent, Kordsiemon helped fill out at least portions of the reverse mortgage application on the Lancaster's behalf. After obtaining the reverse mortgage, the Lancasters continued to work with Kordsiemon to obtain the second life insurance policy. In order to obtain the lowest premium price, Donita

Lancaster applied for a "super preferred" health rating. *Id.* at 11, ¶ 12. Although such a rating secured a lower premium price, Donita Lancaster's good heath ultimately made the policy very difficult to sell, at least for the profit they intended to make. *Id.* The Lancasters provided an initial payment of $71,860.64 that ensured the policy would survive the period of contestability. *Id.* at 12, ¶ 13.

In June 2010, Kordsiemon sold the Lancasters a second life insurance policy worth approximately $1.3 million—this time on the "borrowed life" of one of the Lancaster's daughters. *Id.* at 12, ¶ 14. The policy was also purchased from Athene. *Id.* at 14, ¶ 17. The Lancasters allegedly bought this second policy on the understanding that the value of the policy would grow, and that their daughters would be able to draw from the funds without paying taxes on the investment. *Id.* at 12, ¶ 13–14. Kordsiemon also sold the Lancasters three additional Athene annuity products into which they diverted many of their remaining liquid assets. *Id.* at 13, ¶ 16. The Lancasters invested significant funds up front into these policies, including $50,791.22 on the Athena "borrowed life" policy, $50,000 on Athene annuity policy 203502, $14,562.29 on Athene annuity policy 205528,[1] and $16,654.87 on Athene annuity policy 205529.[2] *Id.* at 13, ¶ 16.

---

[1]  Three withdrawals had been made from Athene policy 205528 totaling $4,384.91. *Statement of Material Facts*, at 13, ¶ 16, Dkt. 45-1.

[2]  Four withdrawals had been made from Athene policy 205529 totaling $6,623.63. *Statement of Material Facts*, at 13, ¶ 16, Dkt. 45-1.

**MEMORANDUM DECISION AND ORDER - 3**

During this time, the Lancasters tried to sell the original $1.5 million insurance policy, but could not find a buyer at a desirable price, apparently because of Donita Lancaster's good health. Instead, the Lancasters were paying monthly premiums of approximately $1260 on Donita' Lancaster's policy, and $870 on the "borrowed life" policy, totaling $2,170 per month in premium payments. *Id.* at 15, ¶ 20. Over the next two years the premiums continued to rise. *Id.* at 21, ¶ 21.

In 2014, the Lancasters claim they began to feel as though they had been "deceived." *Id.* 16, ¶ 22. The Lancasters were having difficulty paying the rising monthly premium payments, and eventually their insurance policies lapsed. *Id.* at 17, ¶ 23. The Lancasters claim they were unable to pay the premiums because they had committed "over half of their entire liquid net worth…to various indexed and fixed annuities with high-surrender schedules and life insurance." *Id.* at 17, ¶ 23. The Lancasters estimate they spent approximately $290,563.78 on the products sold by Kordsiemon. *Id.*

The Lancasters filed lawsuit against Kordsiemon and the insurance companies, which was removed to this Court on June 30, 2015. The Lancasters allege claims for fraud, grand theft, and racketeering. *See Am. Compl.*, Dkt. 9. Athene is no longer party to this litigation, pursuant to an out-of-court settlement agreement. *Id.*

## LEGAL STANDARD

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of the

summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool [ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986). There must be a genuine dispute as to any *material* fact – a fact "that may affect the outcome of the case." *Id.* at 248.

When cross-motions for summary judgment are filed, the Court must independently search the record for factual disputes. *Fair Housing Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). The filing of cross-motions for summary judgment – where both parties essentially assert that there are no material factual disputes – does not vitiate the court's responsibility to determine whether disputes as to material fact are present. *Id.*

The moving party bears the initial burden of demonstrating the absence of a genuine dispute as to material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson,* 212 F.3d 528, 532 (9th Cir.2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in her favor. *Deveraux,* 263 F.3d at 1076. The non-moving party must go beyond the pleadings and show "by her [ ] affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine dispute of material fact exists. *Celotex,* 477 U.S. at 324.

However, the Court is "not required to comb through the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified Sch. Dist.,* 237 F.3d 1026, 1029 (9th Cir. 2001) (quotation omitted). Instead, the "party opposing summary judgment must direct [the Court's] attention to specific triable facts." *Southern California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003).

## ANALYSIS

### 1. Cross-Motions for Summary Judgment

Both the Lancasters and Kordsiemon argue that summary judgment is proper as a matter of law. The Lancasters argue that Kordsiemon is liable for racketeering under I.C. § 18-7801 *et seq.*, ("Racketeering Act") and individual counts of fraud for making false representations which they justifiably relied upon. In contrast, Kordsiemon argues that the racketeering claim should be dismissed because the plaintiffs have failed to show disputed material issues of fact as to each required element of their claims and that Lancasters have released their claims against him because he was an intended third-party beneficiary under the insurance companies' out-of-court agreements. Kordsiemon also argues that the Lancasters have failed to plead fraud with particularity, that the claims for

fraud are time barred, and that there are disputed issues of material fact that preclude a grant of summary judgment in favor of the Lancasters.

> A.   *Racketeering under I.C. § 18-7801 et seq.*

Under Idaho's Racketeering Act, a "pattern of racketeering activity" is expressly defined as:

> [E]ngaging in at least two (2) incidents of racketeering conduct that have the same or similar intents, results, accomplices, victims or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated incidents, provided at least one (1) of such incidents occurred after the effective date of this act and that the last of such incidents incurred within five (5) years after a prior incident of racketeering conduct.

I.C. § 18-7803(d). "Racketeering" consists of at least two predicate offenses that are "*chargeable or indictable* under [relevant] sections of the Idaho Code. . . ." I.C. § 18-7803(a) (emphasis added). Prior incidents of racketeering conduct include acts involving theft and fraud. *See* I.C. § 18-7803(a)(2), (10). The Lancasters allege Kordsiemon engaged in six separate acts of "Grand Theft/Fraud" associated with the two life insurance policies and four annuities he sold to the Lancasters. *See Am. Compl.*, at 6–11, Dkt. 9. If found liable under the Racketeering Act, an individual may be responsible for up to "three (3) times the actual damages proved and the cost of the suit, including reasonable attorney fees." I.C. § 18-7805(a).

> a.   **Kordsiemon as a Third Party Beneficiary to the Settlement Agreement.**

Kordsiemon argues that the Lancaster's racketeering claim should be dismissed because the Settlement Agreement with Athene expressly designates Kordsiemon as a

third-party beneficiary and released him from future liability associated with the five Athene policies. *See Kordsiemon Decl., Exhibit I, "Settlement and Release,"* at 41, §§ 6(a)–(c), Dkt. 45-4.  The Lancasters responded by arguing that Kordsiemon is not in fact a third party beneficiary, but instead only an incidental beneficiary who was not intended to benefit from the settlement contract. The Lancasters' argument is not persuasive because Kordsiemon is clearly an intended third party beneficiary to the Settlement Agreement.

The language of Lancaster's Settlement and Release Agreement provides that Kordsiemon is released from future liability stemming directly from the five Athene policies:

> (b)    <u>Waiver and Limited Release of KORDSIEMON by the LANCASTERS.</u> Immediately upon execution of this Settlement and Release, the LANCASTERS, for themselves, their agents, servants, heirs and legal representatives, and their successors and assigns, fully and unconditionally waive, release and forever discharge KORDSIEMON from all claims, demands, causes of action, obligations, damages and liabilities of any nature whatsoever (any of the foregoing, individually, a "Claim" and collectively the "Claims"), which the LANCASTERS or their heirs, legal or personal representatives, agents, and their successors or assigns have, or hereafter may have against KORDSIEMON, whether known or unknown, relating to the marketing, sale and administration of the POLICIES. The waiver and release granted to KORDSIEMON in this Paragraph is limited to the LANCASTERS' claims related to the POLICIES, and is not intended to waive or release any claims against KORDSIEMON relating to the Voya Financial [ReliaStar] policy or policies described in the LAWSUIT.
>
> (c)    <u>Materiality of Releases</u>.    The LANCASTERS acknowledge and agree that the waivers and releases given in Paragraphs 6(b) and 6(c) above are material terms of this Settlement and Release and without such, ATHENE would not have entered into this Settlement and Release.

*Id.*

Under Idaho law, "a contract, made expressly for the benefit of a third person, may be enforced by him at any time before the parties thereto rescind it." I.C. § 29-102. When determining whether a party is a third-party beneficiary, Idaho law relies upon the "intent" doctrine:

> The question whether a contract was intended for the benefit of a third person is generally regarded as one of construction of the contract. The intention of the parties in this respect is determined by the terms of the contact as a whole, construed in the light of the circumstances under which it was made and the apparent purpose that the parties are trying to accomplish.

*Idaho Power Co. v. Hulet*, 90 P.3d 335, 338 (Idaho 2004) (citing 17A Am.Jur.2d § 441). This intent must be "gleaned from the contract itself unless that document is ambiguous, whereupon the circumstances surrounding its formation may be considered." *Id.* at 337.

Even though Kordsiemon is not a beneficiary to *all* provisions in the contract, it is clear that Kordsiemon is the intended beneficiary of ¶ 6(b) of the settlement and release language of the agreement *Id.* at 41, ¶ 6(b) ("fully and unconditionally waive, release and forever discharge KORDSIEMON. . ."). Thus, the Lancasters are barred by the Settlement Agreement from bringing any claims against Kordsiemon arising out of their acquisition of the Athene policies.

### b. The Settlement Agreement and RICO Predicate Acts.

Kordsiemon argues that in releasing Kordsiemon from liability stemming from the settled Athene policies, the Lancasters cannot use the settled policies and the alleged conduct arising from the policies as predicate acts to satisfy the RICO claim. The parties did not cite any case law either supporting or disputing this conclusion in the briefing. At

oral argument, Kordseimon directed the Court's attention to three cases not in the briefing that allegedly supported the notion that a settlement agreement precludes using the conduct surrounding the policies as predicate acts under RICO.[3] However, all three of these cases are notably distinguishable from the case at hand in that a judge in those cases had ruled that an alleged predicate act would fail as a matter of law and therefore, since the potential predicate act had been dismissed, it could not be used as a predicate act under RICO. Here, the Court faces an entirely different issue, because the Settlement Agreement was not a ruling by a court and there has been no decision on the merits as to whether the Kordseimon's actions with regard to the Athene policy constitute predicate acts.

Because the Court and the parties were unable to find any controlling or persuasive case law to guide the Court in resolving this issue, the Court will look to the language of the Settlement Agreement to determine whether the Settlement Agreement prohibits using the Athene policies as predicate acts for the RICO claim. When interpreting a contract in Idaho, the Court must first look at the contract's language, and "[in] the absence of ambiguity, the document must be construed in its plain, ordinary and proper sense, according to the meaning derived from the plain wording of the instrument." *Potlatch Educ. Ass'n v. Potlatch School Dist. No. 285*, 148 Idaho 630, 633, 226 P.3d 1277, 1280 (2010) (citing *C & G, Inc. v. Rule*, 135 Idaho 763, 765, 25 P.3d 76,

---

[3] *HMK Corp. v. Walsey*, 637 F. Supp. 710 (E.D. Va. 1986), aff'd, 828 F.2d 1071 (4th Cir. 1987); *Brannan v. Eisenstein*, 804 F.2d 1041 (8th Cir. 1986);

78 (2001). Whether a term in a contract is ambiguous is a question of law for the Court to decide, but interpreting an ambiguous term is an issue of fact for the jury. *Id*.

Here, the Settlement Agreement released Kordsiemon from "all claims, demands, causes of action, obligations, damages and liabilities of any nature whatsoever . . . ." The Court finds that the Settlement Agreement does not contain any ambiguous language relating to what obligations were discharged in the contract based on the plain meaning of the terms. "Claim" is defined by *Black's Law Dictionary* as "a legal assertion; a legal demand; taken by a person wanting compensation, payment, or reimbursement of a loss under a contract." *Claim*, *Black's Law Dictionary* (2nd ed.). "Demand" is defined as "a demand properly made, as to form, time, and place, by a person lawfully authorized." *Legal Demand*, *Black's Law Dictionary* (2nd ed.). "Obligation" is defined as "a legal duty, by which a person is bound to do or not to do a certain thing." *Obligation*, *Black's Law Dictionary* (2nd ed.). "Liabilities" is defines as "the state of being bound or obliged in law or justice to do, pay, or make good something; legal responsibility." *Liability*, *Black's Law Dictionary* (2nd ed.). All of these terms relate to some legal responsibility that Kordsiemon was released from relating to the Athene policies. However, these responsibilities are financial liabilities and damages arising from the Athene policies, and there is no language in the Settlement Agreement that would prevent the Lancasters from using the Athene policies as predicate acts. The Lancasters are attempting to use conduct relating to the Athene policies merely to establish that there was a pattern of racketeering activity. The Lancasters are not engaging in any of the prohibited uses of the Athene

**MEMORANDUM DECISION AND ORDER - 11**

policies included in the language of the Settlement Agreement because they are not seeking liabilities or damages from the Athene policies. The Lancasters are seeking liability solely for the Realistar policy and are merely attempting to use the Athene policies as predicate acts. Because there is no case law to the contrary and the Settlement Agreement does not prevent it, the Lancasters are permitted to use the Athene policies as predicate acts, but may not seek damages or liability on any of those acts because Kordsiemon is an intended third party beneficiary of the contract.

  **B.**  *The Lancasters' Motion for Summary Judgment.*

  The Lancasters also moved for summary judgment as a matter of law for their racketeering claim. However, this Motion for Summary Judgment is also improper, as there are a number of disputed issues of material fact.

  In order to be found liable for racketeering, the plaintiff must establish four elements: The defendant is 1) a "person" capable of holding a legal or beneficial interest in property, 2) whose activities constitute an "enterprise" 3) that engaged in a "pattern of racketeering activity" and 4) commissioned "at least two (2) incidents of racketeering conduct. . . ." *See* I.C.§ 18-7803. The primary factual dispute in this matter addresses element four, whether Kordsiemon committed "at least two incidents of racketeering conduct." *Id.*

  The Lancasters argue that Kordsiemon committed either grand theft and/or fraud when he sold the Lancasters each of the six "investment" policies. *See Am. Compl.*, Dkt. 9. A person steals property and commits theft when, "with intent to deprive another of

property or to appropriate the same to himself, or to a third person, he wrongfully takes, obtains or withholds such property from an owner thereof." I.C. § 18–2403(1). A person is guilty of grand theft when he commits a theft and the value of the property taken "exceeds three hundred dollars." I.C. 18-2407(1)(b)(1). Whether Kordsiemon sold the Lancasters the policies with the requisite intent needed for a charge of grand theft is in dispute, and "[w]here intent of the accused is an ingredient of the crime charged, its existence is a question of fact which must be submitted to the jury." *Morissette v. United States*, 342 U.S. 246, 274 (1952). Summary judgment is not proper regarding the predicate grand theft allegations.

Similarly, whether Kordsiemon's conduct amounts to fraud is ultimately a question for the trier of fact. In Idaho, fraud consists of nine elements that the plaintiff has the burden to prove:

> (1) a statement or a representation of fact; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity; (5) the speaker's intent that there be reliance; (6) the hearer's ignorance of the falsity of the statement; (7) reliance by the hearer; (8) justifiable reliance; and (9) resultant injury.

*Doe v. Boy Scouts of America*, 356 P.3d 1049, 1054 (Idaho 2015). The question of Kordsiemon's knowledge of falsity at the time of the sale, the materiality of his statements, his intent, and whether the Lancaster's reliance was "justifiable" are questions that must be decided by the trier of fact. *Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995) (citing *Durning v. First Boston Corp.*, 815 F.2d 1265, 1268 (9th Cir. 1987)). For these reasons, both Kordsiemon's and the Lancasters' Motions for Summary Judgment are denied.

### C.     *Fraud*

Kordsiemon also seeks summary judgment on the remaining claim for fraud, claiming that the Lancasters did not plead the claim with sufficient "particularity" as required under Rule 9 of the Federal Rules of Civil Procedure, and, alternatively, that it is time-barred under the statute of limitations.

Rule 9(b) of the Federal rules of Civil procedure require a party alleging fraud "must state with particularity the circumstances constituting fraud. . ." Fed. R. Civ. P. 9(b). Rule (9b) demands that "the circumstances constituting the alleged fraud 'be specific enough to give defendants notice of the particular misconduct ... so that they can defend against the charge and not just deny that they have done anything wrong.'" *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009) (citing *Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001)). The complaint must specify "such facts as the *times, dates, places, benefits received, and other details* of the alleged fraudulent activity." *Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir. 1993) (emphasis added).

It is untimely of Kordsiemon to allege a violation of Rule 9(b) in his Rule 56 motion for summary judgment.  Rule 9(b) exists to ensure that defendants have sufficient knowledge of the fraud alleged in a complaint to present a defense in an answer.  A Rule 9(b) motion is proper when a defendant feels that a fraud allegation has not been properly pleaded with enough particularly to allow defendants to respond adequately.  To the Court's knowledge, it is highly unusual for a Rule 9(b) motion to be brought within a motion for summary judgment.  Rule 9(b) motions belong alongside a Rule 12(b)(6)

motion to dismiss.  The Court can find no case law in the Ninth Circuit ruling on a Rule 9(b) issue within a motion for summary judgment.  Kordsiemon has not directed the Court's attention to any case that supports his conclusion that Rule 9(b) can be pled as an affirmative defense that can be brought anytime in litigation.  Rather, in this case, Kordseimon responded to the Complaint in an answer well over one year ago.  (Dkt. 10).  Discovery in this matter has been completed.  Kordsiemon has had no difficulty thus far in responding to any of the fraud allegations.

   The time for Kordsiemon to allege a violation of Rule 9(b) has long passed.  The remedy when a plaintiff fails to plead fraud with particularity is the same as in a Rule 12(b)(6) motion for failure to state a claim on which relief can be granted.  That is, the court may allow the plaintiff to amend his complaint or may dismiss the complaint all together.  *See Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1107 (9th Cir. 2003) ("A motion to dismiss a complaint or claim 'grounded in fraud' under Rule 9(b) for failure to plead with particularity is the functional equivalent of a motion to dismiss under Rule 12(b)(6) for failure to state a claim . . . . Because a dismissal of a complaint or claim grounded in fraud for failure to comply with Rule 12(b) has the same consequence as a dismissal under Rule 12(b)(6), dismissals under the two rules are treated in the same manner.").  Because this case is so advanced in the litigation process and discovery is concluded, it is unreasonable of Kordseimon to ask the Court to start the case anew with an amended complaint.

Even if Kordsiemon's Rule 9(b) claim was timely, the Lancaster's have sufficiently pleaded facts necessary to provide adequate notice to Kordsiemon for him to mount a defense to the allegations. The Lancaster's Amended Complaint demonstrates that the underlying fraud allegation surrounds the sale of the $1.5 million ReliaStar life insurance policy number 401076 on Donita's life. *See Am. Compl.*, at 7 ¶ 14, Dkt. 9. The Lancasters allege that on or about August 12, 2009, Kordsiemon sold the Lancasters this policy "by creating false impressions, which he knew to be false when he made them." *Id.* All of these false impressions and statements occurred during conversations that the Lancasters had with Kordsiemon at their home in Jerome County, Idaho. *Id.* at 3 ¶ 10. Included in these false impressions was the assertion that the life insurance policy value was "'growing' as if the life insurance policies. . .were annuities." *Id.* at 5 ¶ 20. The Lancasters have alleged Kordsiemon withheld material information about the nature of the policies he sold, including the "cost of insurance. . .nor did he explain any expenses associated with these plans." *Id.* at 3 ¶ 9. They allege that Kordsiemon "utilized fear tactics" to convince the Lancasters "their loved ones would not be financially able to cover funeral expenses." *Id.* at 5 ¶ 17. They allege that Kordsiemon provided false advice which induced them to utilize other saving and investment incomes, including their "individual retirement accounts" and a "reverse mortgage on their home," so that he could still collect his commission when the policy lapsed. *Id.* at 7 ¶ 14. The Lancasters assert that they have spent $290,563.78 on products sold by Kordsiemon, including $98,555.40 on the ReliaStar premium, all of which Kordsiemon received commission on.

**MEMORANDUM DECISION AND ORDER - 16**

*Id.* at 3 ¶ 7–4 ¶ 12. These allegations, as a whole, provide ample notice regarding the "times, dates, places, benefits received, and other details of the alleged fraudulent activity." *Neubronner*, 6 F.3d at 672. Dismissal of the claim is not proper under Rule 9(b).

      D.    *Statute of Limitations*

Kordsiemon also contend that the Lancasters did not timely file their claim within Idaho's three-year statute of limitations. Idaho law requires "an action for relief on the ground of fraud or mistake" be brought within three years. I.C. § 5-218(4). However, such cause of action will not "be deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud or mistake." *Id.* "Where discovery of a cause of action for fraud commences the statute of limitations, the date of discovery is a fact question for the jury unless there is no evidence creating a question of fact." *Nerco Minerals Co. v. Morrison Knudsen Corp.*, 90 P.3d 894, 900 (Idaho 2004) (citing *DBSI/TRI v. Bender*, 948 P.2d 151, 162 (Idaho 1997)). "Actual knowledge of the fraud can be inferred if the aggrieved party could have discovered the fraud by reasonable diligence, although the Court will hesitate to infer such knowledge." *Id*.

Kordsiemon argues that the Lancaster's claims should be dismissed because the allegedly fraudulent conduct occurred with the sale of the policies in 2008 and 2009, whereas their initial claim was not filed until July 9, 2015. *Compl.*, Dkt. 1-1. Kordsiemon suggests that at the latest, the Lancasters should have been aware of the allegedly fraudulent activity in the summer of 2011 after "the two-year incontestability period on

**MEMORANDUM DECISION AND ORDER - 17**

Donita's policy had lapsed, no purchaser of the policy could be found, and Plaintiffs could not get a hold of Mr. Kordsiemon." *Def's Br.* at 7–8, Dkt. 45-2 (citing *Decl. Ron Lancaster*, at ¶ 14, Dkt. 37-13).

However, the Lancasters have maintained that they were unaware that any impropriety had taken place until they met with a separate financial advisor in the fall of 2014. *Decl. Ron Lancaster*, at ¶ 15, Dkt. 37-13. In support of this proposition, the Lancasters have submitted declarations regarding their deep trust in Kordsiemon, their lack of knowledge about investments and financial planning, and the continuous reassurances that their investments would be profitable. *See Decl. Ron Lancaster*, at ¶ 3, 15, Dkt. 37-13. The Lancasters also argue they did not know of false statements allegedly provided by Kordsiemon on their insurance applications, and that he may have forged some of their documents. *See Decl. Donita Lancaster*, at ¶ 9, Dkt. 37-14. ("he whited out certain portions of the form that I had signed in 2008, left my signature lines intact, and filled in different information for the 2009 application"); *see also id.* at ¶ 8 (did not know STOLI transactions were illegal).

During oral argument, the Lancasters asked the Court to use *United States v. Darden*, 70 F.3d 1507 (8th Cir. 1995) to conclude that even if the policies are time barred by the statute of limitations, the Court could still use the policies as predicate acts for the RICO claim.  However, *Darden* does not provide for this and is distinguishable from the case at hand.  The Eighth Circuit in *Darden*, in a sixty-seven page decision, looked at an appeal of an enormous criminal RICO case in Missouri.  *Id*.  One defendant argued that

his prosecutions were time-barred by the general federal five-year statute of limitations. *Id*. at 1525. However, the Eighth Circuit concluded that the predicate acts in that case were not time barred because of a unique statute of limitations within the criminal RICO statute that provides that a prosecution is not time barred if the defendant committed a predicate act within five years of the indictment. *Id*. The case at hand is a civil case, and the statute of limitations exception that the Eighth Circuit relied on in *Darden* is not controlling here. Therefore, the Court declines to accept the Lancasters' argument under *Darden*.

All of the Lancasters' assertions, among others, amount to admissible evidence that create an issue of fact as to the date of discovery. These issues of fact preclude this Court from granting Summary Judgment. Therefore, both the Lancaster's Motion for Summary Judgment (Dkt. 37), as well as Kordsiemon's Motion for Summary Judgment (Dkt. 45) are denied.

## ORDER

**IT IS ORDERED:**

1. Plaintiff's Motion for Summary Judgment (Dkt. 37) is **DENIED**.
2. Defendant's Motion for Summary Judgment (Dkt. 45) is **DENIED**.



DATED: September 29, 2016

_____
B. Lynn Winmill
Chief Judge
United States District Court

MEMORANDUM DECISION AND ORDER - 20